# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### WICHITA FALLS DIVISION

|  |  |  |
|---|---|---|
| **KENNETH ADERHOLT et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:15-cv-00162-O** |
| | § | |
| **BUREAU OF LAND** | § | |
| **MANAGEMENT et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motion for Partial Dismissal of Plaintiffs' Amended Complaint and Brief in Support (ECF Nos. 48–49), filed February 26, 2016; Plaintiffs' Response to Defendants' Partial Motion to Dismiss (ECF No. 53), filed March 22, 2016; Defendants' Reply in Support of Their Motion for Partial Dismissal of Plaintiffs' Amended Complaint (ECF No. 61), filed April 4, 2016; Plaintiff's Sur-Reply in Opposition to Federal Defendants' Motion to Dismiss (ECF No. 73), filed April 20, 2016; and Defendants' Reply to Plaintiff's Surreply (hereinafter "2d Reply") (ECF No. 74), filed April 29, 2016.  Also considered by the Court is the Brief of Amici Curiae in Support of Plaintiffs' Request for Quiet Title and Declaratory Judgment and in Opposition to Defendants' Motion to Dismiss (ECF No. 58), filed March 30, 2016.[1]  Also considered by the

---

[1] Amici curiae are the following United States Representatives and United States Senators of the 114th United States Congress: U.S. Representative Mac Thornberry, U.S. Senators John Cornyn and Ted Cruz, and U.S. Representatives Kevin Brady, Michael Burgess, John Carter, Mike Conaway, John Culberson, Blake Farenthold, Bill Flores, Louie Gohmert, Kay Granger, Jeb Hensarling, Sam Johnson, Kenny Marchant, Michael McCaul, Randy Neugebauer, Ted Poe, John Ratcliffe, Pete Sessions, Randy Weber, and Roger Williams.

Court is Amicus Curiae Brief of the Texas Department of Agriculture in Support of Plaintiff's

Complaint (ECF No. 79), filed May 10, 2016.

Having considered the motion, related briefing, and applicable law, the Court finds that

Defendants' Motion for Partial Dismissal of Plaintiffs' Amended Complaint should be and is hereby

**GRANTED in part** and **DENIED in part**.

## I.      BACKGROUND

This case concerns the alleged unconstitutional and arbitrary seizure of approximately 90,000

acres of private property along the Red River in Texas.   *See* Am. Compl. 1, 18, ECF No. 40.

Plaintiffs include individual property owners (the "Surveyed Individual Plaintiffs" and "Unsurveyed

Individual Plaintiffs" or, collectively, the "Individual Plaintiffs"), their respective county

governments of Wichita, Clay, and Wilbarger County, Texas (collectively, the "County Plaintiffs"),

and Clay County Sheriff Kenneth Lemons, Jr. ("Sheriff Lemons") in his official capacity.[2]  *Id.*

In 1803, the Louisiana Purchase established the southern bank of the Red River as the

boundary between the United States and Spain, with the United States acquiring ownership of the

riverbed and the lands north of the Red River.  *Id.* ¶ 31.   Spain's subsequent 1819 treaty with the

United States (hereinafter the "Adams-Onís Treaty") established the border of the two nations as the

"south cut bank" of the Red River.   *Id.* ¶ 32.   In 1838, after the Republic of Texas gained

independence from Mexico, the Republic of Texas and the United States entered into a treaty

upholding the border.  *Id.* ¶ 33.   Under both treaties, the Republic of Texas and the United States

each maintained the ability to access and navigate the river, but the United States owned the

---

[2] The State of Texas ("Texas") and the Texas General Land Office ("GLO") were also granted leave to intervene as respective co-Plaintiffs.  *See* Order, Mar. 14, 2016, ECF No. 50; Order, Mar. 24, 2016, ECF No. 55.   However, the present Motion concerns neither Texas nor the GLO.

riverbed.  *Id*.

In 1922, Oklahoma sued Texas claiming that Oklahoma owned the entirety of the Red River riverbed.  *Id*. ¶ 34.  The United States intervened, also claiming title to the entirety of the riverbed, and insisting that Oklahoma could not claim title because the Red River was not navigable in the disputed stretch.  *Id*. ¶ 35.  In 1923, the Supreme Court reaffirmed, in relevant part, that the south cut bank, or the southern gradient boundary, marked the northern border of Texas.  Am. Compl. ¶ 37, ECF No. 40; *Oklahoma v. Texas*, 260 U.S. 606, 625 (1923).

The Supreme Court defined the south cut bank as the "bank at the mean level of the water, when it washes the bank without overflowing it . . . subject to the right application of the doctrines of erosion and accretion and of avulsion to any intervening changes."  Am. Compl. ¶ 40, ECF No. 40.  In accordance with its 1923 ruling, the Supreme Court commissioned a survey to determine the gradient boundary along the Red River.  *Id*. ¶ 50.  The survey, certified by the Supreme Court in 1925, did not establish a permanent boundary along the entire 116-mile stretch relevant to this dispute, but instead identified parts of the gradient boundary at that point in time.  *Id*. ¶¶ 50–51, 53.  Furthermore, the survey does not presently represent the south bank's gradient boundary due to the Red River's erosion and accretion over the past 90 years.  *Id*.

In 1999, Texas and Oklahoma entered into an interstate compact (hereinafter the "Compact"), ratified by Congress in 2000.  Prior to the Compact, jurisdictional uncertainty among Oklahoma, Texas, and the United States along the Red River rendered each sovereign unable to prosecute for crimes or collect taxes.  *Id*. ¶ 55.  For instance, such uncertainty resulted in large portions of the northern border of Texas being left as a "no man's land" where drug distribution, prostitution, illegal gambling, and dog and cockfighting regularly occurred without means of redress.  *Id*. ¶¶ 55–56.

Through the Compact, Texas and Oklahoma established the permanent boundary between the states as the vegetation line along the south cut bank of the Red River, a line visibly identifiable and close to the boundary established by *Oklahoma*. *Id.* ¶ 57. The Compact explicitly granted Texas sovereignty over all lands south of the southern vegetation line. *Id.* ¶ 58. Furthermore, the Compact did not change the title or rights of any person or entity, whether public or private, to any of the lands adjacent to the Red River, and it did not change the boundaries of those lands. *Id.* ¶ 59.

In 2003, the Bureau of Land Management ("BLM") independently began the process of conducting a resurvey along portions of the Red River to determine the United States's interest in the Red River riverbed. *Id.* ¶ 61. In 2007 and 2008, BLM representatives entered and affixed physical survey markers (the "Survey Markers") to the properties owned by Patrick Canan ("Canan"), Kevin Hunter ("Hunter"), and Jimmy Smith ("Smith") (collectively, the "Surveyed Individual Plaintiffs"), each of whom are citizens of either Clay or Wichita Counties and collectively hold title to land in the two counties. *Id.* ¶¶ 6–7, 16, 62–64. One marker on Canan's land, approximately one mile from the Red River, designates a boundary line of Texas as part of its identification of BLM-claimed public lands on Canan's land. *Id.* ¶¶ 6, 62. According to the BLM's survey, approximately 1,400 acres of Canan's 2,000 acres belong to the United States. *Id.* Similarly, one marker on Hunter's land designates the medial line of the Red River but is placed half a mile from the main course of the Red River. *Id.* ¶¶ 7, 63. According to BLM's survey, approximately 250 of Hunter's 510 acres belong to the United States. *Id.* Finally, one marker on Smith's land, approximately three-quarters of a mile away from the Red River, designates a boundary line of Texas as part of its identification of BLM-claimed public lands within Smith's land. *Id.* ¶¶ 16, 64. According to the BLM's survey, approximately 100 of Smith's 140-150 acres belong to the United

4

States.  *Id*.  Furthermore, the Survey Markers state it is unlawful to remove them.  *Id*. ¶ 66.

Thereafter, the BLM published updated survey plats (the "Plats") covering portions of the Red River through Clay and Wichita counties in the Federal Register.  *Id*. ¶ 65 (citing 74 Fed. Reg. 28061–62; 75 Fed. Reg. 8738–39).  These Plats show the area within Canan, Hunter, and Smith's properties where BLM placed survey markers as designated federal land.  *Id*.  Plaintiffs allege that Defendants' surveying method applies to the entire 116-mile stretch of the Red River within Clay, Wichita, and Wilbarger Counties, as the Plats identify this land as federal land.  *Id*. ¶ 67.

As a result, Plaintiffs assert that Defendants claim they own up to, and possibly exceeding, 90,000 acres of Texas land lying outside of the south vegetation line and boundary bank of the Red River.  *Id*. ¶ 74.  However, Defendants do not intend to survey most of the land they claim to own. *Id*. ¶ 79.  For instance, at an October 13, 2015 public hearing on the BLM's proposed revisions to its Resource Management Plan ("RMP"), BLM representatives notified attendees that "we don't have the funds to survey it. We're not allowed to survey it right now. Until that happens we can't get those implementation level decisions that you want answered—until we get whether or not we should or should not do something with it later on."  *Id*. ¶ 74.

The Federal Land Policy and Management Act ("FLPMA") of 1976, which governs BLM's policies and procedures, requires the development and maintenance of land use plans.  *Id*. ¶ 81. Under the FLPMA, the Secretary of the Interior is instructed to "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." *Id*. (citing 43 U.S.C. § 1712(a)).  Plaintiffs allege they have no reasonable way of knowing whether they must comply with the BLM's regulations on portions of their properties or who is lawfully on land claimed by Defendants.  *Id*. ¶ 89.  They also assert that the process demonstrates federal

5

assertion of title, ownership and control over Plaintiffs' land and has clouded the Individual Plaintiffs' titles. *Id.* ¶ 86.

In addition, the County Plaintiffs allege they do not know what amount of land within its jurisdiction is taxable, Sheriff Lemons does not know who is trespassing, and the Individual Plaintiffs do not know the amount of land which is taxable. *Id.* ¶ 91.  Moreover, Plaintiffs allege that the BLM's actions caused the resurgence of the "no man's land" that the Compact was enacted to prevent. *Id.* ¶ 104.  Plaintiffs have experienced numerous incidents of trespass by the public, on foot as well as by ATVs. *Id.* ¶ 105.  As a result, trenches from ATVs have destroyed portions of the bed and banks of the Red River, the Red River is constantly littered with beer cans and trash, and local law enforcement from Texas and Oklahoma have been unable to prevent or control routine debauchery. *Id.* ¶ 107.  Plaintiffs claim that the cost of this "no man's land" to the Plaintiff Counties and to law enforcement is significant. *Id.* ¶¶ 110–11.

Plaintiffs bring the following claims: (1) enforcement of the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a as to the Surveyed Individual Plaintiffs; (2) quiet title as to the Unsurveyed Individual Plaintiffs; (3) quiet title for County Plaintiffs; (4) declaratory, mandamus, and injunctive relief for County Plaintiffs against Defendants for unlawful and unconstitutional acts regarding Defendants' survey methods; (5) declaratory, injunctive, and mandamus relief to determine proper survey standards for determining the south bank and gradient boundary of the Red River; (6) declaratory, injunctive, and mandamus relief for Sheriff Lemons; (7) declaratory, injunctive, and mandamus relief for violation of the Due Process Clause of the Fifth Amendment; and (8) declaratory, injunctive, and mandamus relief for unreasonable seizure of property under the Fourth Amendment. *See generally* Am. Compl., ECF No. 40.

## II.   LEGAL STANDARDS

### A.   FRCP 12(b)(1) - Subject Matter Jurisdiction

Rule 12(h)(3) of the Federal Rules of Civil Procedure provides that "if the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3); s*ee Stafford v. Mobil Oil Corp.*, 945 F.2d 803, 805 (5th Cir. 1991) ("Failure adequately to allege the basis for diversity jurisdiction mandates dismissal.").   Federal subject-matter jurisdiction is limited; federal courts may entertain only those cases involving a question of federal law or those where parties are of diverse citizenship.  *See* 28 U.S.C. §§ 1331, 1332.  Federal courts have original jurisdiction over claims when the complaint states claims arising under federal law. *Id.* § 1331; *Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 392 (5th Cir. 1977).  Diversity jurisdiction requires that: (1) the amount in controversy must exceed $75,000; and (2) the citizenship of each plaintiff must be diverse from the citizenship of each defendant. *See* 28 U.S.C. § 1332(a); *see Stafford*, 945 F.2d at 804.  "It is well-established that the diversity statute requires 'complete diversity' of citizenship: A district court cannot exercise diversity jurisdiction if one of the plaintiffs shares the same state citizenship as any one of the defendants." *Corfield v. Dall. Glen Hills LP*, 355 F.3d 853, 857 (5th Cir. 2003).  The party invoking federal jurisdiction has the burden of establishing it. *Id.*

"Every party that comes before a federal court must establish that it has standing to pursue its claims." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013); *see also Barrett Comp. Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 218 (5th Cir. 1989).  "The doctrine of standing asks 'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Cibolo Waste*, 718 F.3d at 473 (quoting *Elk Grove Unified Sch. Dist. v. Newdow*,

542 U.S. 1, 11 (2004)).

Standing has both constitutional and prudential components.  *See Cibolo Waste*, 718 F.3d at 473 (quoting *Elk Grove*, 542 U.S. at 11) (stating standing "contain[s] two strands: Article III standing . . . and prudential standing").  Constitutional standing requires a plaintiff to establish that she has suffered an injury in fact traceable to the defendant's actions that will be redressed by a favorable ruling.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  The injury in fact must be "concrete and particularized" and "actual or imminent," as opposed to "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560.  "Prudential standing requirements exist in addition to 'the immutable requirements of Article III,' . . . as an integral part of 'judicial self-government.'" *ACORN v. Fowler*, 178 F.3d 350, 362 (5th Cir.1999); *Lujan*, 504 U.S. at 560.  "The goal of this self-governance is to determine whether the plaintiff 'is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial power.'"  *Id.* (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 n.8 (1986)).  The Supreme Court has observed that prudential standing encompasses "at least three broad principles," including "the general prohibition on a litigant's raising another person's legal rights . . . ."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014); *Cibolo Waste*, 718 F.3d at 474 (quoting *Elk Grove*, 542 U.S. at 12); *see also Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 290 (2008) (discussing cases where third-parties sought "to assert not their own legal rights, but the legal rights of others"); *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 773 (2000) (noting "the assignee of a claim has standing to assert the injury in fact suffered by the assignor").

### B.      FRCP 12(b)(6) - Failure to State a Claim

Federal Rule of Civil Procedure 8(a) requires a claim for relief to contain "a short and plain

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).   Rule 8 does not require detailed factual allegations, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   If a plaintiff fails to satisfy Rule 8(a), the defendant may file a motion to dismiss the plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6).

To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556).   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).   "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff.   *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007).   The Court is not bound to accept legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss.   *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to

relief. *Id.*

"Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (citations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A court may also consider documents that a defendant attaches to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to the plaintiff's claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

"If it appears that a more carefully drafted pleading might state a claim upon which relief could be granted, the court should give the claimant an opportunity to amend his claim rather than dismiss it." *Kennard v. Indianapolis Life Ins. Co.*, 420 F. Supp. 2d 601, 608–09 (N.D. Tex. 2006) (Fish, C.J.) (citing *Friedlander v. Nims*, 755 F.2d 810, 813 (11th Cir.1985); *accord Taylor v. Dall. Cty. Hosp. Dist.*, 976 F. Supp. 437, 438 (N.D. Tex. 1996) (Fish, J.). Likewise, "leave to amend a pleading should be freely given and should be granted unless there is some justification for refusal." *Kennard*, 420 F. Supp. at 609 (quoting *U.S. ex rel Willard v. Humana Health Plan of Tex.*, 336 F.3d at 375, 386 (5th Cir 2003)).

## III.   ANALYSIS

Defendants move to dismiss all of Plaintiffs' claims, except for Count One, under Rules 12(b)(1) and 12(b)(6). The Court will address each of Defendants' arguments in turn, beginning its analysis of each claim with subject matter jurisdiction under 12(b)(1).

### A.   Count Three: County Plaintiffs' QTA Claim

In Count Three, the County Plaintiffs seek to quiet title as to the disputed property. *See* Am.

10

Compl. 31, ECF No. 40.  Defendants claim that Count Three should be dismissed because the County Plaintiffs do not satisfy the jurisdictional requirements of the QTA.  *See* Defs.' Br. Supp. Mot. 6, ECF No. 49.  Defendants argue that "[a] plaintiff must claim an ownership interest in the subject property, and that claim must be disputed by the United States," neither of which Plaintiffs demonstrate.  *Id*. at 7.   Furthermore, Defendants state that "[t]he QTA's waiver of sovereign immunity is expressly limited by a number of conditions," including the mandate that any complaint alleging a QTA claim must "set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property."  *Id*. at 7 (quoting 28 U.S.C. § 2409a(d)).  The Court will address each argument in turn, beginning its analysis with subject matter jurisdiction.

1.     Subject Matter Jurisdiction

Defendants argue that "[t]he Counties' QTA claim fails because they do not allege that they own land that the United States also claims."  *Id*. at 8.  Defendants aver that while the County Plaintiffs "attempt to avoid this fundamental defect by alleging that they hold an automatic tax lien" on individual properties, "[a] temporary tax lien . . . is not such an ownership interest," and a "fleeting-non-ownership interest" for a short time each year "cannot suffice to allow the Count[y Plaintiffs] to bring a QTA claim with respect to third parties' property."  *Id*. at 8–10.

Plaintiffs respond that "[a] party need only claim *some* interest in the property to create a disputed title to real property."  Pls.' Resp. 5–6, ECF No. 53 (emphasis added).  Plaintiffs allege that the "BLM's map does not show a 'hypothetical threat' but an actual threat to the County Plaintiffs' . . . justiciable interests."  *Id*. at 6 (citing Am. Compl. ¶ 87, ECF No. 40; *Zeigler v. Zeigler*, 632 F.2d 535, 538 (5th Cir. 1980)).

"[T]he United States, as sovereign, is immune from suit save as it consents to be sued . . . ,

11

and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).   A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed."  *United States v. King*, 395 U.S. 1, 4 (1969).  The QTA provides such a waiver, stating, "The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a).

The Court is unaware of any precedent where a county or municipality successfully brought a QTA claim on the basis of taxation and regulation interests.  Some courts have recognized limited claims counties may bring besides actual title disputes, holding that "[a] party need only claim *some ownership interest* in the property to create 'disputed title to real property,'" not necessarily holding, for instance, a fee simple title.  *Mafrige v. United States*, 893 F. Supp. 691, 698 (S.D. Tex. 1995) (emphasis added).  Such an ownership interest may include, for example, an oil and gas lease, easement, or right of access.  *See, e.g., Mafrige*, 893 F. Supp. at 698; *Werner v. United States*, 9 F.3d 1514, 1516 (11th Cir. 1993); *Shultz v. Dep't of Army*, 886 F.2d 1157, 1159 (9th Cir. 1989)).  In addition, several county plaintiffs have challenged the boundaries of public right-of-ways.  *See, e.g., Kane Cty. v. United States*, 934 F. Supp. 2d 1344 (D. Utah 2013), *aff'd in part, rev'd in part and remanded*, 722 F.3d 1205 (10th Cir. 2014)); *Cty. of Shoshone of Id. v. United States*, 912 F. Supp. 2d 912 (D. Id. 2012).

At least one federal court has held that a municipality's "taxing" interest is an insufficient interest in title to waive sovereign immunity under the QTA.  In *City of Sault Ste. Marie v. Andrus*, the court held that the plaintiff municipality, which claimed the subject land would no longer be

12

subject to city taxes or ordinances, did not state a valid claim under the QTA because seeking to establish the right to exercise police and taxing powers was not a property interest envisioned by the QTA.  458 F. Supp. 465, 471 (D.D.C. 1978).

Furthermore, the Court finds that to the extent County Plaintiffs assert an "interest" under an alternative theory of *parens patriae*, their claim still fails.  Plaintiffs claim that "[t]hough a case of first impression before this court, counties, like states, meet the requirements for a *parens patriae* action because both have a quasi-sovereign interest 'in the health and well-being' . . . of its residents in general."  Pls.' Resp. 7, ECF No. 53 (quoting *State of La. ex rel. Ieyoub v. Borden, Inc.*, CIV. A. 94-3640, 1995 WL 59548, at *1 (E.D. La. Feb. 10, 1995)).  Plaintiffs argue that "if [counties] ha[ve] such a quasi-sovereign interest," they are "real part[ies] in interest for diversity purposes."  *Id*. However, in *Ieyoub*, the court only determined whether subject matter jurisdiction occurred for diversity jurisdiction purposes, not for a specific statute such as the QTA. 1995 WL 59548, at *1.

While Plaintiffs are correct that the Northern District of Texas has not explicitly held whether counties may assert a QTA claim under a *parens patriae* theory, precedent from both the Fifth Circuit and sister circuits instructs they may not.  *See*, *e.g., Prince George's Cty. v. Levi*, 79 F.R.D. 1, 4 (D. Md. 1977) ("While states have been accorded standing in federal courts under the doctrine of *parens patriae*, this doctrine has not been extended to counties."); *see also Brazoria Cty. v. Hartford Cas. Ins. Co.*, No. CIV. A. G 04-691, 2005 WL 1364837, at *3 (S.D. Tex. June 7, 2005) (citing *City of Safe Harbor v. Birchfield*, 529 F.2d 1251, 1256 n.7 (5th Cir. 1976) ("Counties and other political subdivisions do not have this right.")).  "Counties, as political subdivisions of the state, have only those powers necessary to the accomplishment of their declared objectives."  *See Warren Cty. v. North  Carolina*, 528 F. Supp. 276, 276 (E.D.N.C. 1981).  Unlike that of a state,

13

"[t]he power of a political subdivision of a state is 'derivative and not sovereign', and it may only sue to vindicate its own interests." *Levi*, 79 F.R.D. at *4 (citing *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir.), *cert. denied*, 414 U.S. 1045 (1973)).

Based on the foregoing, the Court finds that Defendants' Motion to Dismiss the County Plaintiffs' QTA claim is **GRANTED** for lack of subject matter jurisdiction.

### B.     Count Two: Unsurveyed Individual Plaintiffs' QTA Claim

In Count Two, Plaintiffs seek to quiet title of the property owned by the Unsurveyed Individual Plaintiffs.  Am. Compl. 29, ECF No. 40.  Defendants contend that "by failing to identify the United States' claimed interest, or any concrete dispute with the United States, they fail to comply with the QTA's requirements and their claim should be dismissed" on both 12(b)(1) and 12(b)(6) grounds.  Defs.' Br. Supp. Mot. 12, ECF No. 49.  The Court addresses each contention in turn.

### 1.     Subject Matter Jurisdiction

Defendants argue that "the Unsurveyed Individual Plaintiffs . . . fail to allege the existence of an actual title dispute that would allow their claims to proceed." *Id*.  Defendants also contend that to the extent Plaintiffs rely on the BLM's Plats, these "do not provide the United States' position as to the actual boundary of federal lands," but instead plainly state they are "only '*estimates*'—both as to the designation of the south gradient and medial lines, and public acreage."  Defs.' Reply 5, ECF No. 61 (emphasis added); *see also* Pls.' App. Supp. Resp. Ex. 1 ("BLM Plat"), ECF No. 53-1.

Plaintiffs argue that its Amended Complaint "details extensively the actions that . . . [] Defendants have undertaken, both direct and indirect, and which are inconsistent with and dispute Plaintiffs' ownership."  Pls.' Resp. 8, ECF No. 53.  Plaintiffs argue, for instance, that Defendants

"have published [Plats], affixed [S]urvey [M]arkers on [the Individual] Surveyed Plaintiffs' property, [and] initiated a [RMP] to regulate the area . . . ." *Id.*  Plaintiffs also note that "[t]he White House has even threatened to veto H.R. 2130—the bill seeking to settle the title dispute —because it would impact federal lands." *Id.*  H.R. 2130 mandates that "[t]he Secretary [of the BLM] disclaims any right, title, and interest to land located south of the South Bank boundary line in the affected area," which "affected area" defined as "lands along the approximately 116-mile stretch of the Red River from its confluence with the North Fork of the Red River on the west to the 98th meridian on the east between the States of Texas and Oklahoma."  Red River Private Property Protection Act, H.R. 2130, 114th Cong. §§ 2(a); 9(1).  The relevant White House ("Administration") published document states, "The Administration strongly opposes H.R. 2130, which would set aside *existing Federal surveys* . . . and *transfer lands out of Federal ownership* without ensuring a fair return to the taxpayer."  Am. Compl. ¶ 103 (citing Statement of Admin. Policy, Exec. Office of the President: H.R. 2130—Red River Private Property Protection Act (Dec. 8, 2015)).

       "Two prerequisites exist for jurisdiction under the QTA: '(1) the United States must claim an interest in the property, and (2) there must be a dispute over the title to that property.'"  *United States v. 6.17 Acres of Land, More or Less, Situated in Par. of St. Charles*, No. 10-4569, 2011 WL 5119105, at *3 (E.D. La. Oct. 27, 2011) (quoting *Leisnoi, Inc. v. United States*, 170 F.3d 1188, 1191 (9th Cir. 1999)).  Here, the parties do not dispute that the BLM has produced the relevant Plats showing that the United States claims estimated acreage of the Unsurveyed Individual Plaintiffs' land.  *See* Pls.' Resp. 8, ECF No. 53; Defs.' Br. Supp. Mot. ¶¶ 12, 16, ECF No. 49.  Thus, the Court must determine whether the publishing of Plats in the Federal Register and the Administration's statement expressing strong disagreement with H.R. 2130's prohibition against federal claim to lands

south of the south gradient boundary establishes the Government's claim of an interest in the property dispute.

"Congress has instructed that (subject to exceptions not relevant here) publishing a regulation in the Federal Register must be considered 'sufficient to give notice of [its] contents' to 'a person subject to or affected by it.'" *George v. United States*, 672 F.3d 942, 944 (10th Cir. 2012) (quoting 44 U.S.C. § 1507)). "To be 'subject to or affected by' a regulation, of course, one must be prone, disposed, exposed, liable, or influenced by it." *George*, 672 F.3d at 945 (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *see also* 17 Oxford English Dictionary 30 (2d ed. 1989) (defining "subject" as "exposed or open to; prone to or liable to suffer from something damaging, deleterious, or disadvantageous")).

In addition, when one "subject to or affected by" a regulation is notified of its contents, the statute of limitations period for bringing a QTA claim begins to run. *See George*, 672 F.3d at 945. "[T]he crucial issue in the statute of limitations inquiry [under the QTA] is whether the plaintiff had *notice* of the federal claim, not whether the claim itself is valid." *Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation*, 599 F.3d 1165, 1176–77 (10th Cir. 2010) (quoting *Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008) (emphasis added)). "Thus, '[s]imply put, the limitations period is triggered when a landowner has reason to know that the government claims *some type* of adverse interest in that land.'" *Rio Grande*, 599 F.3d at 1177 (emphasis added)); *see also Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 738 (8th Cir. 2011) ("The government's claim need not be clear and unambiguous."); *Richmond, Fredericksurg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 770 (4th Cir. 1991) ("[[A]ll that is necessary for accrual is 'a reasonable awareness that the Government claims some interest adverse to the

16

plaintiff's.'")).  "One can be on notice of a claim even if that claim lacks any legal merit . . . [T]he rule [does not] change when notice of a claim comes by way of the Federal Register."  *George*, 672 F.3d at 946.

The Court is unaware of any clear precedent controlling this case concerning a published plat of "estimated" acreage claimed by the United States and published in the Federal Register.  On the one hand, the Tenth Circuit examined a case concerning whether the designation of a road right-of-way as a Wilderness Study Area ("WSA") "publish[ed] . . . in the Federal Register is sufficient to give notice to affected parties."  *Kane Cty. v. United States*, 772 F.3d at 1217, *cert. denied*, 136 S. Ct. 318 (2015)).  The court held that "publication in the Federal Register is sufficient notice to trigger the limitations period only where the published notice conflicts with a plaintiff's interest." *Id*. (citing *Kane I*, 934 F. Supp. 2d at 1362).  "Thus, if the published interest does not amount to a claim that a plaintiff lacks . . . [access to the] right-of-way . . . the limitations period is not triggered." *Id*.  The *Kane* court ultimately held that the WSA designation did not amount to a sufficient claim to title because the Secretary had later clarified that the relevant right-of-way was "excepted" from the challenged regulatory requirements.  *See id.*; *see also* 44 Fed. Reg. 72,015 (stating WSAs "shall be subject to valid existing rights.").

Conversely, in *Donnelly v. United States*, a case in which the BLM published in the Federal Register a Plat of Survey concerning newly classified land, the Ninth Circuit held that "by this time at the latest, the [plaintiffs] had sufficient notice 'of the claim of the United States' to start the 12-year limitations period" under the QTA.  850 F.2d 1313, 1319–20 (9th Cir. 1988) (citing 28 U.S.C. § 2409a(g)).  There, the court noted that the plaintiffs did not follow administrative review procedures concerning the land before the QTA was enacted, but conceded that if they had, "their

17

claim . . . under the QTA would not have accrued until some final BLM decision was rendered." *Id*. Nevertheless, in 1961, the BLM filed the Plat of Survey which determined that all but a small portion of the plaintiffs' claim was on withdrawn land, thus triggering the 12-year limitations period, and by that time, the plaintiffs were no longer pursuing administrative remedies. Therefore, *Donnelly* stands for the proposition that publication in the Federal Register constitutes sufficient notice of the federal claim. *Id*. Similarly, in *Chesney v. United States*, the plaintiff brought a QTA claim based on information published in "BLM Limited Dependant Resurvey" plats. *See generally* 632 F. Supp. 867 (D. Ariz. 1985). There, the Government argued that "the Resurvey is critical because it is a manifestation of the government's claim" such that the plaintiff "knew or should have known of the claim" before the 12-year statute of limitations passed under the QTA. *Id*. at 869. The court explained that the proper test is "when the plaintiff 'knew or should have known,' and that is a test of reasonableness." *Id*. at 868. Such knowledge may be established through "*actual* knowledge like a posted sign or an occupation," or "actual or *constructive* notice of a deed." *Id*. (emphasis added). The *Chesney* court further reasoned that the plaintiff "could not bury his head in the sand (or the dry riverbed, as the case might be) waiting for an adverse party to make a dramatic assertion of a claim." *Id*. at 870. Crucially, neither the *Donnelly* nor *Chesney* courts confronted a plat or resurvey marked as an "estimate."

Here, based on the applicable law, the Court finds that no clear precedent is available to apply at this early stage in the litigation to the Unsurveyed Individual Plaintiffs' QTA claim, concerning: (1) the definition of the Plat as "estimated"; and (2) the correct standard to apply in determining what constitutes the manifestation of a "claim" as to the Unsurveyed Individual Plaintiffs. It appears if publication in the Federal Register is sufficient to trigger notice of a QTA claim for statute of

limitations purposes, then it is sufficient to assert a claim to the property.  However, the Court **DEFERS** ruling on Count Two until trial, but will, of course, continue to evaluate its subject matter jurisdiction over this claim.  *See* Fed. R. Civ. P. 12(i).

### C. Counts Four, Five, and Six: Plaintiffs' Claims Seeking Declaratory, Mandamus, and Injunctive Relief

In Counts Four, Five, and Six, Plaintiffs seek declaratory, mandamus, and injunctive relief "regarding the method for locating the boundary between their property and federal territory." *See* Am. Compl. 34–37, ECF No. 40; Pls.' Resp. 10, ECF No. 53.  Defendants argue that these claims "ultimately seek to adjudicate the United States' title to real property," and thus "must be dismissed because they are not brought under the QTA." Defs.' Mot. 16–17, ECF No. 49.  Defendants further contend that Plaintiffs lack constitutional standing because "they fail to identify a case or controversy." *Id.* at 15.  Defendants also aver that Plaintiffs fail to state a claim upon which relief may be granted. *Id.* at 17.

The Court addresses Defendants' arguments, beginning its analysis with 12(b)(1) jurisdiction. In examining its subject matter jurisdiction under Rule 12(b)(1), the Court first evaluates the parties' respective arguments concerning Plaintiffs' constitutional standing, then *sua sponte* examines Plaintiffs' prudential standing.

#### 1. Subject Matter Jurisdiction

##### a. *Standing*

###### i. Constitutional Standing

Constitutional standing requires a plaintiff to establish that she has suffered or is immediately in danger of suffering an injury in fact traceable to the defendant's actions that will be redressed by

19

a favorable ruling. *Lujan*, 504 U.S. at 560–61; *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983). The injury in fact must be "concrete and particularized" and "actual or imminent," as opposed to "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560. This requirement is in place to ensure that the courts address only cases that present a live case or controversy, and the party invoking federal jurisdiction bears the burden of establishing these elements of standing. *Id.* at 560–61.

The Court finds that Plaintiffs have sufficiently alleged Article III standing. First, Defendants appear to have conceded at this early stage in the litigation that the Individual Surveyed Plaintiffs have a "concrete and particularized" injury in fact in the form of the Survey Markers being driven into their respective properties. *See, e.g.*, Defs.' Br. Supp. Mot. 13, ECF No. 49 (stating that as to the Individual Surveyed Plaintiffs, "the Amended Complaint specifically alleges that Defendants have undertaken surveys . . . '[which] show the area within Canan, Hunter, and Smith's property where BLM placed survey markers, designating Canan, Hunter, and Smith's land as federal lands'" but remarking that "[]the Amended Complaint contains no similar allegations for the other plaintiffs . . . . As a result, [the Unsurveyed Individual] Plaintiffs have failed to make the particularized allegations required under § 2409a(d)."). The Court agrees that Plaintiffs have sufficiently asserted that the Individual Surveyed Plaintiffs have alleged a concrete and particularized injury in fact.[3]

Furthermore, the Court finds that the County Plaintiffs' "asserted injuries to its tax base[s] and property tax revenues satisfy Article III's injury-in-fact requirement." *Cty. of Cook v. Bank of*

---

[3] Count Five of the Amended Complaint includes both the Surveyed and Unsurveyed Individual Plaintiffs; to the extent that the Court finds the Surveyed Individual Plaintiffs have standing, the Court need not analyze this issue as to the Unsurveyed Individual Plaintiffs at this time. *See infra* Section III.C.1.a; *see also* Am. Compl. ¶¶ 201–218, ECF No. 40; *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (concluding that because at least one group of plaintiffs had standing in a case where plaintiffs were seeking a declaratory judgment, the Court "need not consider the standing issue" as to the other groups of plaintiffs.).

*Am. Corp.*, No. 13 C 2280, 2015 WL 1303313, at *3 (N.D. Il. Mar. 19, 2015) (citing *Gladstone, Realtors v. Vill. of Bellwood,* 441 U.S. 91, 110–11 (1979) ("A significant reduction in property values directly injuries a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services.")); *see also* Am. Compl. ¶ 196, ECF No. 40. In addition, even to the limited extent of Individual Surveyed Plaintiffs' land, the Court finds that Sheriff Lemons suffers a concrete and particularized injury by not being able to clearly enforce criminal statutes that turn on property ownership, including Texas Penal Code § 30.005 concerning criminal trespass, and Texas Parks and Wild Life Code § 61.002 concerning hunting on private property without an owner's consent. *Id*. ¶ 86.

Second, the Court finds that Plaintiffs' claims are also sufficiently "actual and imminent" to confer constitutional standing. Both of the aforementioned harms are alleged to be both occurring and likely to continue occurring in the future. *See id*. Third, the Court finds that Plaintiffs' claims would be "redressed by a favorable ruling," whether under declaratory or injunctive relief, or mandamus, by providing the clarity Plaintiffs seek as to the appropriate survey method. Therefore, the Court finds that Plaintiffs have established constitutional standing.

### ii.   Prudential Standing

The Court also considers *sua sponte* whether Plaintiffs have prudential standing under the APA. The Supreme Court has "interpreted § 10(a) of the APA to impose a prudential standing requirement in addition to the requirement, imposed by Article III of the Constitution, that a plaintiff have suffered a sufficient injury in fact." *Nat'l Credit Union Admin v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998). "For a plaintiff to have prudential standing under the APA, 'the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be

21

protected or regulated by the statute . . . in question." *Id.* (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970)).  The Supreme Court has stated that the "zone of interests" test "denies a right of review if the plaintiff's interests are . . . marginally related to or inconsistent with the purposes implicit in the statute." *Clarke v. Secs. Indus. Assn'n*, 479 U.S. 388, 399 (1987).  Therefore, "[t]he proper inquiry is simply 'whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected . . . by the statute.'" *Nat'l Credit Union Admin.*, 522 U.S. at 492 (citing *Data Processing*, 397 U.S. at 153).

The FLPMA mandates that "public lands and their resources are periodically and systematically inventoried." 43 U.S.C. § 1701(a)(2).  Furthermore, the BLM must keep the inventory current "to reflect changes in conditions and to identify new and emerging resource and other values." 43 U.S.C. § 1711(a).  The FLPMA also "requires that 'the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values.'" 43 U.S.C. § 1701(a)(8).

Here, Plaintiffs seek clarification as to the current inventory to reflect apparent changes evidenced in Defendants' placement of Survey Markers and the published Plats, the confusion from which has, at a bare minimum, impacted aesthetics and law enforcement.  The Court finds that Plaintiffs readily meet prudential standing requirements. *See, e.g., Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1179 (9th Cir. 2000) (quoting 43 U.S.C. § 1701(a)(8) (holding that plaintiffs sufficiently pleaded prudential standing as to the FLPMA due only to their "aesthetic and "recreational interest" in land)).

       b.       *Whether Plaintiffs Avoid the QTA's Requirements by Characterizing Their QTA Claims as Non-QTA Claims*

Defendants argue that "[a] plaintiff cannot, by artful pleading, avoid the requirements and limitations of the QTA if its claim challenges the United States' land ownership." Defs.' Mot. 17, ECF No. 49. Plaintiffs contend that they "seek a declaration of their rights and responsibilities under the common law, the ruling of the United States Supreme Court in *Oklahoma v. Texas*, and the Fourth and Fifth Amendments to the United States Constitution." *Id*. at 10. Plaintiffs also contend that "Counts 4–8 are not traditional quiet title claims" as a "declaration of the proper *method* for finding the riverbank" neither requires this Court to "draw the boundary line for federal property" nor "adjudicate the boundary of federal land" to mandate that Defendants "delineate their claims with reasonable specificity." *Id*. at 15 (emphasis added).

"Congress intended the [QTA] 'to provide the exclusive means by which adverse claimants [can] challenge the United States' title to real property.'" *United States v. Mottaz*, 476 U.S. 834, 846 (1986) (quoting *Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 (1983)). "'[W]hen Congress has dealt in particularity with a claim and [has] intended a specified remedy'—including its exceptions—to be exclusive, that is the end of the matter; the APA does not undo the judgment." *Match-E-Be-Nash-She-Wish Band of Pottwatomi Indians v. Patchak*, 132 S. Ct. 2199, 2205 (2012) (quoting *Block*, 461 U.S. at 286). "From its title to its jurisdictional grant to its venue provision, the Act speaks specifically and repeatedly of 'quiet title' actions." *Patchak*, 132 S.Ct. at 2206. "That term is universally understood to refer to suits in which a plaintiff not only challenges someone else's claim, but also asserts his own right to disputed property." *Id*. (citing Black's Law Dictionary 34 (9th ed. 2009) (defining an "action to quiet title" as '[a] proceeding to establish a plaintiff's title to land by compelling the adverse claimant to establish a claim or be forever estopped from asserting it"); *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545

U.S. 308, 315 (2005) ("[T]he facts showing the plaintiffs' title . . . are essential parts of the plaintiffs' [quiet title] cause of action") (quoting *Hopkins v. Walker*, 244 U.S. 486, 490 (1917)).  Plaintiffs cannot "circumvent the QTA's statute of limitations by invoking other causes of action, among them the APA."  *Patchak*, 132 S.Ct. at 2206 (citing *Block*, 461 U.S. at 277).

In *Patchak*, however, the Supreme Court clarified that there were instances in which the QTA did not apply, specifically because "Patchak [wa]s not an adverse claimant."  *Id.* at 2207.  There, the plaintiff did not raise a QTA claim and "d[id] not contend that he own[ed] the [relevant] Property, nor d[id] he seek any relief corresponding to such a claim."  *Id.*  The Supreme Court explained that he was "not trying to disguise a QTA suit as an APA action."  *Id*. at 2207–08.  In other words, the plaintiff was "bringing a different claim, seeking different relief, from the kind the QTA addresses." *Id*. at 2209.

While the plaintiff in *Patchak* sought relief qualitiatively different from that which the QTA could provide, the Supreme Court did not address whether a single action could be brought including both a QTA claim *and* another claim.  However, the Ninth Circuit has squarely held, "§ 2409a(e)[of the QTA] allows jurisdiction over a title dispute where the title claim is founded on alleged administrative wrongdoing, beyond a simple assertion of title by the government."  *Donnelly*, 850 F.2d at 1318; *see also Lee v. United States*, 809 F.2d 1406, 1409 n.2 (9th Cir. 1987) ("We do not hold . . . that the [QTA] constitutes the exclusive source of jurisdiction for all claims against the United States involving the United States' disposition of public lands . . . . The Administrative Procedure Act provides jurisdiction in cases of administrative wrongdoing.").

Similarly, the Northern District of Texas has examined claims falling under both the QTA and other provisions, such as the Administrative Procedure Act ("APA").  *City of Dall. v. Hall*, 2007

24

WL 3125311 (N.D. Tex. Oct. 24, 2007) (Solis, J.).  In *City of Dallas*, the "Federal Defendants argue[d] that the City cannot avoid the QTA and its restrictions by asserting that the easement is invalid [under a different statute] because the QTA provides the exclusive waiver of sovereign immunity to challenge the United States' title to real property." *Id.* at \*7.  However, the court ultimately held that "the plain language of the QTA indicates that its drafters did not intend for it to be applied to this type of case," because "the City [plaintiff] is not asserting a property interest in the land and is not seeking to adjudicate a disputed title to real property." *Id.*  Because the City sought to contest the agency's decision to acquire certain property, the APA provided a claim.

Here, the Court finds that in Counts Four and Five, Plaintiffs seek a declaratory judgment and injunctive relief to determine the proper *method* for finding the riverbank, rather than a request for the Court to engage in drawing the actual boundary.  As Plaintiffs explain, "[a] declaration of the proper method for finding the riverbank does not require this Court to draw the boundary line for federal property."  Pls.' Resp. 15, ECF No. 53.  In fact, the parties' pleadings demonstrate that the declaration of which survey is appropriate would not necessarily resolve the question of who retains rightful title to the disputed land.  *See*, *e.g.*, Am. Compl. ¶ 180, ECF No. 40 ("Plaintiffs allege that in order to complete a gradient boundary survey along the Red River that is in accordance with the methodology established by the Court in *Oklahoma v. Texas*, 250 U.S. 606 (1923), surveyors must identify the boundary then existing, as of the date of survey, rather than assuming a static boundary and attempting to locate any markers from previous surveys. . . ."); Defs.' Reply 11 n. 9, ECF No. 61 ("Defendants certainly do not dispute that any survey of the federal lands comprising the river bed of the Red River is controlled by the Supreme Court's decisions in *Oklahoma* . . . . However, nothing in that case indicates the creation of an *affirmative obligation* on the part of BLM in managing the

25

federal lands comprising the Red River bed.") (emphasis added).

The Court finds that based on the facts alleged, Plaintiffs may bring a valid QTA claim, as well as a non-QTA claim concerning an "administrative wrongdoing" apart from the "alleged wrongful assertion of title.'" *Donnelly*, 850 F.2d at 1318; *McIntyre v. United States*, 568 F. Supp. 1, 2 (1983) (reaffirming that *Block* explained "the critical analysis is not whether the action is in whole or in part a judicial review from an agency decision but rather whether the relief sought is also available under the [QTA]"); *see also* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically"); *Creighton v. Fleetwood Enters., Inc.*, No. 07-7194, 2008 WL 1746953, at *2 n.1 (E.D. La. Apr. 11, 2008) ("[T]he Federal Rules permit plaintiffs to plead in the alternative." (quoting the same)). Therefore, Plaintiffs' challenge to Defendants' alleged administrative wrongdoing is permitted in addition to Plaintiffs' QTA claims. The Court next addresses whether Counts Four through Six identify an appropriate waiver of sovereign immunity.

> c.      *Defendants' Argument that Plaintiffs Fail to Identify an Alternative Waiver of Sovereign Immunity*

Defendants argue that "Counts Four, Five, and Six should be dismissed because Plaintiffs identify no other waiver of sovereign immunity." Defs.' Mot. 18, ECF No. 49. Defendants argue that neither the Declaratory Judgment Act ("DJA"), the Mandamus Act, nor the APA provide an adequate waiver of sovereign immunity. *Id*. at 19–20.

Plaintiffs counter that they have shown appropriate waivers under the DJA, 28 U.S.C. § 2201, and the Mandamus Act, 28 U.S.C. § 1361. Pls.' Resp. 9, ECF No. 53. Plaintiffs also assert that "5 U.S.C. § 702 [of the APA] waives sovereign immunity for Plaintiffs' DJA and [c]onstitutional

claims."  *Id*.  The Court will address each alleged waiver in turn, beginning with the APA.

i.      APA Waiver

Defendants claim that the APA does not apply because Plaintiffs' "Amended Complaint challenges no specific 'identifiable action or event,' particularly one that marks the 'consummation of some decision making process" under the APA.  Defs.' Mot. 20, ECF No. 49.  Defendants also argue that "[n]owhere in the Amended Complaint is there an allegation that Defendants failed to perform a discrete duty that they were required by law to perform."  *Id*. at 21.

Plaintiffs explain that their "non-QTA claims do not arise under the APA [itself], but instead under the [Supreme] Court's decision in *Oklahoma v. Texas*, the Constitution, the Declaratory Judgment Act, and the Mandamus Act."  Pls.' Resp. 26, ECF No. 53.  The APA's "waiver does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought' by the plaintiff."  *Patchak*, 132 S. Ct. at 2204.  "That provision prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes."  *Id*.

Plaintiffs challenge two types of agency action: (1) "Defendants' failure to act by refusing to conduct surveys or to articulate a reasonably clear method to determine the boundary of federal property"; and (2) "Defendants' actions in affirmatively adopting and applying survey standards that are contrary to *Oklahoma*."  Pls.' Resp. 28, ECF No. 53; Pls.' Sur-Reply 2, ECF No. 73.  Plaintiffs reiterate in their Sur-Reply that they are not challenging "final agency action" in the form of the 2009 surveys, but "failure to act" under the mandates imposed by *Oklahoma* and the FLPMA.[4]  The Court

---

[4] At the conclusion of their Response, Plaintiffs appear to also argue that in the alternative, "[e]ven if Plaintiffs' claims arise under the APA, [] Defendants' challenged actions may constitute final agency action."  Pls.' Resp. 28, ECF No. 53 (capitalization omitted).  Defendant did not address this argument in its Reply, and the Court defers ruling on this argument at this time.

addresses each of Plaintiffs' two challenged agency actions in turn.

### aa.    Failure to Act

"The APA authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004) (quoting 5 U.S.C. § 702). "Where no other statute provides a private right of action, the 'agency action' complained of must be final agency action.'" *Id*. at 61–62 (quoting 5 U.S.C. § 704). "'[A]gency action' is defined in [5 U.S.C.] § 551(13) to include 'the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*.'" *Norton*, 542 U.S. at 62 (emphasis added). In addition, "[t]he reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." *Id*.

The Supreme Court has clarified that the phrase "failure to act" is "properly understood as a failure to take an agency action—that is, a failure to take one of the agency actions (including their equivalents) defined in § 551(13)."[5] *Id*. "[A] 'failure to act' is properly understood to be limited, as are the other items in § 551(13), to a *discrete* action." *Id*. at 63 (emphasis added). "An action called for in a plan may be compelled when the plan merely reiterates duties the agency is already obligated to perform, or perhaps when language in the plan itself creates a commitment binding on the agency." *Id*. at 71. "The APA provides relief for failure to act in § 706(1): 'The reviewing court

---

[5] Agency action is defined in 5 U.S.C. § 551(13) to include 'the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.'" *Norton*, 542 U.S. at 62 (quoting 5 U.S.C. § 551(13)). "All of those categories involve circumscribed, discrete agency actions, as their definitions make clear: 'an agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy' (rule); 'a final disposition . . . in a matter other than rule making (order); a 'permit . . . or other form of permission' (license); a 'prohibition . . . or . . . taking [of] other compulsory or restrictive action' (sanction)'; or a 'grant of money, assistance, license, authority,' etc., or 'recognition of a claim, right, immunity,' etc., or 'taking of other action on the application or petition of, and beneficial to, a person' (relief). *Id.* (quoting § 551(4), (6), (8), (10), (11)).

shall . . . compel agency action *unlawfully withheld* or *unreasonably delayed*.'"  *Id*. at 62 (emphasis added).

Defendants argue that "[n]owhere in the Amended Complaint is there an allegation that Defendants failed to perform a discrete duty that they were required by law to perform. And as discussed above, never do Plaintiffs ask the Court for an order compelling Defendants to undertake any such duty." Defs.' Br. Supp. Mot. 21, ECF No. 49.  Plaintiffs respond that the "[d]evelopment of land use plans, like the [RMP] the BLM is currently developing for the disputed area, are exactly what the FLPMA contemplates under its mandatory instruction to the Secretary of the Interior." Am. Compl. ¶ 83, ECF No. 40.  Plaintiffs ultimately argue that Defendants acted unlawfully under the FLPMA, in light of *Oklahoma*'s mandate that they must prove the ownership of the land they claim pursuant to a gradient survey.  Thus, the Court must determine whether Plaintiffs have stated a claim that Defendants failed to take a discrete action that is legally required.  *Norton*, 542 U.S. at 63–64.

In *Lujan v. National Wildlife Federation*, the Supreme Court considered a failure to act claim under the FLPMA.  497 U.S. 971 (1990).  There, "the plaintiff challenged the Secretary of the Interior's entire 'land withdrawal review program,'" which provided the overview of the BLM's activities in complying with the FLPMA. *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (citing *Lujan*, 497 U.S. at 877–79).  However, "instead of limiting its challenge to a '*single* BLM order or regulation, or even to a completed universe of particular BLM orders and regulations,' the plaintiff challenged 'the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the FLPMA.'"  *Id*. (emphasis added)  Therefore, the *Lujan* Court held that the plaintiffs' claim failed because it functioned as a broad, "programmatic challenge" to the

BLM's program. *Lujan*, 497 U.S. at 891. Therefore, plaintiffs could not "seek wholesale improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Id.*

Similarly, in *Sierra Club v. Peterson*, the Fifth Circuit considered an environmental group's challenge to past, ongoing, and future timber sales approved by the Forest Service, arguing that the Forest Service failed to monitor and properly inventory those sales. 228 F.3d at 565–67. The court ruled that this "challenge is precisely the type of programmatic challenge that the Supreme Court struck down in *Lujan*," as the plaintiff "argued that the Forest Service failed to monitor and inventory properly in conducting these sales." *Id*. at 566. More specifically, "the challenge sought 'wholesale improvement'" of the program, which "is not a justiciable challenge because the program of timber management to which the environmental groups object does not 'mark the consummation' of the agency's decisionmaking process.") (internal citations omitted) (citing *Lujan*, 497 U.S. at 891, 899; *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). The court also clarified that the challenge was not made justiciable "by the fact that the environmental groups identified some specific sales in their pleadings that they argue are final agency actions." *Sierra Club*, 228 F.3d at 567.

The Court finds here, unlike in *Lujan* and *Sierra Club*, Plaintiffs are not launching a "programmatic attack" on the BLM or seeking "wholesale improvement" of the means or speed by which it generally surveys land. Rather, Plaintiffs challenge Defendants' actions in light of two particular circumstances: (1) where Defendants have claimed over 90,000 acres of land that allegedly belong to Plaintiffs; and (2) where *Oklahoma* mandates that a party asserting changes to the boundary must prove this through conducting a gradient boundary survey. Pls.' Resp. 28, ECF No. 53; Pls.' Sur-Reply 2, ECF No. 73. Thus, Plaintiffs argue that the Court may compel Defendants

to conduct a gradient boundary survey to the extent they claim land, as *Oklahoma* requires.  *See, e.g.*,

Am. Compl. ¶ 191, ECF No. 40 ("Defendants have acted unlawfully . . . by asserting federal

jurisdiction over land within Plaintiffs' traditional jurisdiction without specifying the extent of the

property claimed . . . ."); *see also Norton*, 542 U.S. at 71 ("Of course, an action called for [in a

statutorily required land use plan] *may be compelled* when the plan *merely reiterates duties the

agency is already obligated to perform* . . . .") (emphasis added).

Defendants appear to summarily conclude that they are not bound by a Supreme Court

holding because "none of these statutes [identified by Plaintiffs in their Amended Complaint] waive

Defendants' sovereign immunity with respect to Plaintiffs' claims."  Defs.' Br. Supp. Mot. 18–19,

ECF No. 49.  The Court disagrees.  This Court has already reasoned that "[j]udicial precedent may

function as federal law in determining whether an agency acted unlawfully."  Order, Mar. 14, 2016,

ECF No. 50 (citing *Indus. TurnAround Corp. v. NLRB*, 115 F.3d 248, 254 (4th Cir. 1997) ("A

decision of a panel of this court becomes the law of the circuit and is binding on other panels unless

it is overruled by a subsequent en banc opinion of this court of 'a superseding contrary decision of

the Supreme Court.") (striking down an agency decision because it conflicted with Supreme Court

and relevant Circuit precedent).

Furthermore, courts consider even more than Supreme Court precedent in determining

whether agency action complies with federal law.  For instance, a federal district court recently

considered a provision in the California Constitution, holding that the provision imparts an

"affirmative duty" on the state regarding planning and allocating water resources.  *Citizens Legal

Enf't & Restoration v. Connor*, 762 F. Supp. 2d 1214, 1231 (S.D. Cal. 2011).  There, the court held

that the relevant constitutional provision requiring that "the waste or unreasonable use or

unreasonable method of use of water be prevented" was a "sufficiently specific command to be enforceable" as to the agency. The court reasoned that "[a]lthough the text of the Constitution does not explain what 'waste' or 'unreasonable use' means, this provision creates a mandatory duty not to do those things. This would be, to the extent that it applies to [the Bureau of] Reclamation here, a discrete and required duty under *SUWA*." *Id*. Similarly, in *Utah v. Norton*, the court contemplated whether the terms of a "settlement agreement" between state plaintiffs and federal defendants, including the BLM, functioned as federal law and conflicted with other APA requirements such that it bound the BLM to a particular course of wilderness management. *See generally* No. 2:96-CV-0870, 2006 WL 2711798 (D. Utah Sept. 20, 2006). The court concluded that "a careful reading of the [s]ettlement" agreement demonstrated that the BLM and the state plaintiffs did not function as federal law because the settlement agreement's provisions only referred to WSAs created after 1993 and thus did not conflict with an injunction issued by a district court, not because settlement agreements are necessarily incapable of proscribing agency action. *Id*. at *27.

The Court finds that at this early stage in the litigation, Plaintiffs have sufficiently asserted that *Oklahoma* functions as a federal law requiring that a party asserting material changes to the boundary is required to prove these changes pursuant to a gradient survey. The Court further finds that *Oklahoma*'s mandate that asserted changes must be proved by conducting a gradient boundary survey, as a specific federal law in conjunction with the FLPMA's requirement to maintain an inventory of public lands, is not a "general directive[] granting broad discretion," but rather, is "a sufficiently specific command to be enforceable." *Citizens Legal Enf't*, 762 F. Supp. 2d at 1231. Thus, to the extent the boundary is found to be governed by the *Oklahoma* test, the Court may find that Defendants have failed to take the actions required by *Oklahoma*. In addition, to the extent

32

*Oklahoma* requires that a party asserting changes to the boundary must prove such changes through conducting a gradient boundary survey, the Court finds Plaintiffs have pleaded Defendants' actions have been "unlawfully withheld."

For the aforementioned reasons, the Court finds that Defendants' sovereign immunity has been waived under 5 U.S.C. § 702 of the APA on Plaintiffs' "failure to act" claim. Defendants' Motion to Dismiss on subject matter jurisdiction grounds is therefore **DENIED**. Accordingly, the Court need not proceed to analyzing Plaintiffs' second "agency action" claim at this time. The Court will, of course, continually evaluate its subject matter jurisdiction as to Plaintiffs through the course of the litigation.

## ii.   DJA Waiver

The DJA provides, in pertinent part, "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The DJA is "a procedural statute, not an independent basis of federal jurisdiction.' *Hussain v. Mueller*, No. H-07-2755, 2008 WL 2557565, at *1 n.2 (S.D. Tex. June 20, 2008); *see also In re B-727 Aircraft Serial No. 21010*, 272 F.3d 264, 270 (5th Cir. 2001) ("[The DJA] does not provide a federal court with an independent basis for exercising subject-matter jurisdiction.") (citation omitted). The Supreme Court has explained that "the phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

Based on the foregoing, the Court finds that Plaintiffs have established that subject matter jurisdiction for their DJA claim, and Defendants' Motion to Dismiss is **DENIED** as to this claim.

33

### iii.   Mandamus Act waiver

Plaintiffs assert that "[t]he Mandamus Act includes its own waiver of sovereign immunity." Pls.' Resp. 9, ECF No. 53.  Defendants assert that while "the Fifth Circuit has stated that, in certain circumstances, the statute can operate as such a waiver," 28 U.S.C. § 1361 "does not apply to claims where the plaintiff seeks declaratory judgment and injunctive relief."  Defs.' Mot. 19, ECF No. 49. Rather, Defendants aver that the statute "applies only where a plaintiff seeks 'to compel the defendants to affirmatively perform a presently existing duty under the law.'"  *Id*. (quoting *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 767 (5th Cir. 2011)).  Here, Defendants argue that "Plaintiffs do not—for any of their claims—ask the Court for an order compelling Defendants to perform a presently existing duty under the law."  Defs.' Br. Supp. Mot. 20, ECF No. 49.

"In resolving whether [S]ection 1361 jurisdiction is present, allegations of the complaint, unless patently frivolous, are taken as true to avoid tackling the merits under the ruse of assessing jurisdiction."  *Jones v. Alexander*, 609 F.2d 778, 781 (5th Cir. 1980) (citing *Carter v. Seamans*, 411 F.2d 767, 770 (5th Cir. 1969)).  "[T]he Fifth Circuit has held that the Mandamus Act does effect a waiver of sovereign immunity."  *Alabama-Coushatta Tribe of Tex. v. United States*, No. 2:12-CV-83-JRG-RSP, 2013 WL 1279051, at *2 (E.D. Tex. Mar. 8, 2013) (citing *Sheehan v. Army & Air Force Exch. Serv.*, 619 F.2d 1132, 1140 (5th Cir. 1980), *reversed on other grounds*, 456 U.S. 728 (1982)).

"The test for jurisdiction is whether mandamus would be an appropriate means of relief." *Jones*, 609 F.2d at 781.  "Three elements must exist before mandamus can issue: (1) the plaintiff must have a clear right to the relief; (2) the defendants must have a clear duty to act; and (3) no other adequate remedy must be available."  *Id*. (citing *Winningham v. U.S. Dep't of Hous. & Urban Dev.*,

512 F.2d 617, 620–21 (5th Cir. 1975)); *see also Sawan v. Chertoff*, 589 F. Supp. 2d 817, 826 (S.D. Tex. 2008) ("Mandamus is a cause of action of last resort. Even if a plaintiff establishes that a defendant owes him a clear and enforceable duty, mandamus is available only if the plaintiff has no other remedy.").  The Court has already concluded that to the extent *Oklahoma* functions as a federal law requiring that a party asserting material changes to the boundary is required to prove these changes.  *See supra* Section III.C.1.c.i.aa.  Therefore, Plaintiffs have a clear right to relief based on *Oklahoma*'s mandates, and Defendants have a clear duty to act before claiming the boundary has changed.  Through pleading in the alternative, Plaintiffs establish that no other remedy beyond mandamus is available.  Thus, the Court finds it has jurisdiction to consider Plaintiffs' Mandamus Act claim.  Defendants' Motion to Dismiss is **DENIED** as to their 12(b)(1) grounds for dismissal.

2.      12(b)(6) Failure to State a Claim

Defendants argue that "[e]ven if Plaintiffs could identify an applicable waiver of sovereign immunity for Counts Four, Five, and Six, these counts should still be dismissed because Plaintiffs fail to identify any substantive basis for the claims." Defs.' Br. Supp. Mot. 22, ECF No. 49. Defendants argue that "[f]or each of these counts, Plaintiffs wholly fail to identify any substantive claim they are asserting," but instead "broadly allege unlawful conduct by Defendants . . . ." *Id*. Defendants also state that Plaintiffs fail to meet at least the first two elements to constitute a request for mandamus.  *Id*.  Plaintiffs respond that Counts Four, Five, and Six state valid claims for relief under the Constitution, DJA, and Mandamus Act, with the DJA and Mandamus Act being relevant to Counts Four, Five, and Six.  Pls.' Resp. 9, ECF No. 53.  The Court addresses each in turn.

*a.      Claim for Mandamus Relief*

For the reasons stated above, at this stage, it appears that Plaintiffs have sufficiently alleged

35

that they have a clear right to the relief sought, due to the mandates of *Oklahoma* as construed in conjunction with the FLPMA.  In addition, the Court has already determined that Plaintiffs have alleged that Defendants are bound to act, in light of the Supreme Court's mandate.  The Court finds this to be a sufficiently "clear duty" at this stage in the proceedings.  Furthermore, the Court has previously determined that the QTA does not govern Plaintiffs' claims that concern the survey methods, rather than the actual title.  *See supra* Section III.B.1.b. Therefore, the Court finds that as to Claims Four through Six, no other remedy is adequately available in order to require that action be taken.  Accordingly, Defendants' Motion to Dismiss is **DENIED** as to this claim.

*b.*     *DJA Claim*

Furthermore, as to Plaintiffs' DJA claim, "the operation of the Declaratory Judgment Act is procedural only."  *Skelly*, 339 U.S. at 671.  "The Declaratory Judgment Act allow[s] relief to be given by way of recognizing the plaintiff's right even though no immediate enforcement of it [i]s asked." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950).  "Since it is the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgment action, a party bringing a declaratory judgment action must have been a proper party had the defendant brought suit on the underlying cause of action." *Collin Cty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 169 (5th Cir. 1990).

The Court has already determined that Plaintiffs have Article III standing as to their underlying dispute.  *See supra* Section III.C.1.  Because DJA operates as a procedural mechanism, that is all that is required to state a claim.  Therefore, Defendants' Motion to Dismiss is **DENIED** as to Plaintiffs' DJA claims.

**D.     Count Eight: Plaintiffs' Fourth Amendment Claim**

In Count Eight, Plaintiffs seek declaratory, injunctive, and mandamus relief due to the BLM unreasonably seizing their property under the Fourth Amendment.  Am. Compl. 41, ECF No. 40. Defendants argue that "Plaintiffs' Eighth Count asserts an unreasonable seizure of their property under the Fourth Amendment," but "because the claim actually challenges the United States' land ownership, it must be dismissed under *Block*."  Defs.' Br. Supp. Mot. 23, ECF No. 49.  Plaintiffs contend that "[a] claim for unreasonable seizure is distinct from a claim to quiet title: the touchstone of quiet title is ownership, whereas the touchstone of unreasonable seizure is unreasonable interference in property rights."  Pls.' Resp. 18, ECF No. 53.  Therefore, Plaintiffs argue that "[b]ecause quiet title claims are distinct from unreasonable seizure claims . . . . the QTA cannot subsume Fourth Amendment claims."  *Id*. at 18–19.

The Fourth Amendment protects people from "unreasonable searches and seizures of 'their persons, houses, papers, and effects.'" *Soldal v. Cook Cty.*, 506 U.S. 56, 62 (1992) (quoting U.S. Const. amend. IV).  "A 'seizure' of property . . . occurs when there is some meaningful interference with an individual's possessory interest in that property." *Soldal*, 506 U.S. at 63 (quoting *Jacobsen*, 466 U.S. 109, 113 (1984)); "The Fourth Amendment's protections against unreasonable seizures clearly extend to real property." *Presley v. City of Charlottesville*, 464 F.3d 480, 485 (4th Cir. 2006) (citing *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 52 (1993); *Freeman v. City of Dall.*, 242 F.3d 642, 647 (5th Cir. 2001) (en banc)).

In addition, the Fifth Circuit has noted that the Government may properly be subject to a seizure action even when it does not claim title the property in question.  For example, in *Severance v. Patterson*, the Fifth Circuit noted that a Fourth Amendment seizure claim is "not the functional equivalent of a quiet-title action" in a case involving public rights-of ways, as "[t]itle to the

37

properties at issue rests with Severance, not the State. The Officials do not claim title . . . ." 566 F.3d 490, 495 (5th Cir. 2009).

The Court finds that at this early stage in the litigation, the relief Plaintiffs seek as to this claim would not necessarily amount to the relief the QTA could afford.  For instance, further factfinding could demonstrate that a seizure occurred, but that the government does not ultimately claim title to the relevant property.  *See id.*  Therefore, because the QTA does not provide the relief Plaintiffs seek through this claim, the claim is challenging "administrative wrongdoing" rather than title ownership.  *See*, *e.g.*, *Donnelly*, 850 F.2d at 1318.  Defendants do not challenge Plaintiff's Fourth Amendment Claim on 12(b)(6) grounds.  Therefore, Defendants' Motion to Dismiss is **DENIED** as to Plaintiffs' Fourth Amendment Claim.

### E.       Count Seven: Plaintiffs' Fifth Amendment Claim

In Count Seven, Plaintiffs seek declaratory, injunctive, and mandamus relief due to the BLM claiming Plaintiffs' property without "say[ing] with reasonable precision which land is federal." Pls.' Resp. 21, ECF No. 53; *see also* Am. Compl. 38, ECF No. 40.  Defendants argue that Plaintiffs fail to "allege facts supporting a cognizable due process challenge."  Defs.' Br. Supp. Mot. 26, ECF No. 49.  Defendants explain that "Plaintiffs do not identify any specific statute or regulation that is so vague that it fails to give them fair notice of what conduct is prohibited," but instead "appear to argue that otherwise non-vague laws would be rendered so based on Defendants' failure to provide more specificity in delineating the border of federal lands."  *Id.*

Plaintiffs clarify that they "do not challenge the constitutionality of the statutes regulating the use of federal land; they challenge the constitutionality of Federal Defendants' *failure to say* with reasonable precision which land is federal."  Pls.' Resp. 20–21, ECF No. 53 (emphasis added).  In

38

other words, Plaintiffs allege that they "seek a declaration of their rights and responsibilities under the common law," namely "regarding the method for locating the boundary between their property and federal territory, and the constitutionality of defendants asserting jurisdiction over property for which defendants refused to articulate a boundary." *Id*. at 10.

The Supreme Court has reasoned, "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a state may impose." *State Farm*, 538 U.S. at 417; *see also Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."); *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972) ("Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids.'" (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) (alteration in original)).

"This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *F.C.C. v. Fox Television Stations, Inc.*, 132 S.Ct. 2307, 2317 (2012) (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)). "It requires the invalidation of laws that are impermissibly vague." *Fox Television*, 132 S.Ct. at 2317. "A conviction of punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Id*. (citing *Williams*, 553 U.S. at 304).

However, while uncertainty as to ownership may impact the way that certain state laws are enforced, such as those raised by Sheriff Lemons in asserting Article III standing, the Court is unaware of a cognizable Fifth Amendment challenge to a process that in turn cripples the enforcement ease of such laws. In other words, while Plaintiffs may challenge a particular law as unconstitutionally vague, it appears that Plaintiffs are instead challenging an alleged unlawful *process* which then imposes uncertainty on an otherwise clear law. Therefore, Defendants' Motion to Dismiss is **GRANTED** as to Plaintiffs' Fifth Amendment claim.

## IV.    CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**. In addition, the Court **DEFERS** ruling on Count Two until trial.

**SO ORDERED** on this **29th day** of **June, 2016.**


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**